## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jul 25 2018, 8:52 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Melinda K. Jackman-Hanlin
Plainfield, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of R.M. & D.M. (Children) and W.M. (Father);

W.M. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

July 25, 2018

Court of Appeals Case No.
18A-JT-168

Appeal from the Hendricks
Superior Court

The Honorable Karen M. Love,
Judge

Trial Court Cause No.
32D03-1703-JT-9
32D03-1703-JT-10

**May, Judge.**

[1] W.M. ("Father") appeals the involuntary termination of his parental rights to R.M. and D.M. (collectively, "Children"). Father argues the Department of Child Services ("DCS") did not present sufficient evidence the conditions under which Children were removed from Father's care would not be remedied; the continuation of the parent-child relationship posed a threat to Children's well-being; and termination of parental rights was in Children's best interests. We affirm.

## Facts and Procedural History

[2] A.H. ("Mother")[1] and Father are the biological parents of R.M. and D.M., born January 3, 2005, and July 29, 2009, respectively. On September 7, 2015, DCS received a report that Children were home alone without adequate food and that Mother and her boyfriend used methamphetamine. Father did not live with Mother and had "limited contact with the [C]hildren." (Ex. Vol. V at 81.)

[3] DCS filed a petition to adjudicate Children as Children in Need of Services ("CHINS") on September 22, 2015. The initial plan was in-home placement with a safety plan; however, on September 23, Children were removed from Mother's home because Mother continued to use methamphetamine. On October 7, 2015, the trial court held a hearing on the CHINS petition and

---

[1] Mother's parental rights to Children were also terminated. She does not participate in this appeal.

Mother admitted Children were CHINS. On November 18, 2015, Father admitted Children were CHINS, and they were adjudicated as such.

[4] Also on November 18, the trial court entered its dispositional decree, ordering Father, who also had an open CHINS case in Putnam County regarding two of his other children, to participate in reunification services, including: obey the law, refrain from using illegal substances, complete a substance abuse assessment and follow all recommendations, provide random drug screens, attend visitation with Children, complete required services in the Putnam County case, participate in the Fatherhood Engagement program, and continue to work with Cummins Behavioral Health to address his mental health needs. Father was compliant with services for an extended period of time, and the court allowed a trial home visit on April 13, 2016. Children were placed with Father until July 5, 2016, when Father tested positive for methamphetamine and amphetamine. Children have been in foster care since that time.

[5] On September 21, 2016, the trial court held a permanency hearing during which the court approved a concurrent plan of reunification and adoption. Father was arrested for possession of methamphetamine in November 2016. At a review hearing on December 19, 2016, the trial court noted Father had not complied with services, had not visited Children, and had not cooperated with DCS. In January 2017, Father was arrested for domestic violence, with Mother as the victim. On March 14, 2017, DCS filed a petition to terminate the parental rights to Children of both Mother and Father.

[6] In May 2017, Father was arrested for Class C misdemeanor possession of paraphernalia; in June 2017, Father was arrested for intimidation and resisting arrest; in July 2017, Father was arrested for invasion of privacy. Father was incarcerated in the Putnam County jail at the time of the termination fact-finding hearing. His probation officer testified Father had been on probation since 2013 but had failed to successfully complete a probationary term. On May 31 and July 13, 2017, the trial court held fact-finding hearings on DCS's termination petition. On December 26, 2017, the trial court issued its order involuntarily terminating Father's parental rights to Children.

# Discussion and Decision

[7] We review termination of parental rights with great deference. *In re K.S., D.S., & B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[8] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must

subordinate the interests of the parents to those of the children, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id.* at 836.

[9] To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g*

*denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

[10] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference."[2] *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[11] Father challenges the trial court's conclusions that the conditions under which Children were removed were not likely to be remedied and continuation of the parent-child relationship posed a threat to Children's well-being. As Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need only decide if the trial court's conclusion supports one of these requirements. *See In re L.S.*, 717 N.E.2d at 209 (because statute written in disjunctive, court needs to find only one requirement to terminate parental rights). Father also argues termination is not in Children's best interests.

---

[2] Herein, Father does not challenge the trial court's findings, and thus we accept them as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").

### *Reasonable Probability Conditions Would Not Be Remedied*

[12]     The trial court must judge a parent's fitness to care for the child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that the conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[13]     When assessing a parent's fitness to care for a child, the trial court should view the parents as of the time of the termination hearing and take into account the changes that have occurred during the proceedings. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. However, the trial court must also "evaluat[e] the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of [a] child." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.

[14]     Father argues termination is not warranted because he "was not a contributing factor as to the removal of the children," (Br. of Appellant at 9), and because he has demonstrated prolonged periods of sobriety. However, while we do review the changes in the conditions under which Children were removed from a parent's care, we also consider "those bases resulting in continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Father does not challenge the trial court's findings supporting its conclusion that the conditions under which Children were removed from Mother's care would not be remedied, which include:

89. Ariel Irwin Peel has been the Family Case Manager for [Children] since October 27, 2015. Court finds Family Case Manager, Irwin Peel, is experienced, credible and thorough in her work. Simultaneous to this case in Hendricks County, Father had 2 CHINS cases for his younger children [De. and W.] in Putnam County where he lives.

90. Father has failed to contact Family Case Manager, Irwin Peel, weekly when he has been out of jail. Family Case Manager, Irwin Peel, has reached out and consistently attempted to contact Father. Since July 2016, Father has been in and out of jail at least five times.

91. When these cases first started, Father was participating in services with Putnam County DCS and he progressed positively to the point that the children were placed with him for a trial home visit on April 13, 2016. Father failed to show for random drug screens in June, 2016. Family Case Manager, Irwin Peel, made an unannounced visit to Father's home on June 27, 2016, and he tested positive for methamphetamine and amphetamine for a screen on June 27, 2016. On July 5, 2016, Family Case Manager, Irwin Peel, went to the home and Father denied using methamphetamine but admitted he used spice. Family Case Manager, Irwin Peel, could not attempt a safety plan with Father because he didn't think he had a problem.

92. Family Case Manager, Irwin Peel, ended Father's trial home visit on July 5, 2016. Since the trial home visit ended, Father has continued to use methamphetamine and has been in and out of jail for probation violations on new charges at least five times.

93. Father has been very difficult to contact. When Father was in jail, Family Case Manager, Irwin Peel, met with him and gave him her contact information to contact her when he was released from jail. When he was released, Father would take weeks to

contact Family Case Manager, Irwin Peel. Father did not have a phone at times and it was difficult to contact him to discuss services or request he provide drug screens. Father would not follow up with appointments for services or visits with [Children] and would end up getting arrested again.

* * * * *

96. A schedule for Father was set up to visit [Children]. Father had eight or nine visits scheduled in August 2016. Father only attended one visit.

97. Father had seven visits scheduled in September 2016 and Father failed to show up at all. Ms. Branson [Putnam County Family Case Manager] attempted to contact Father to get the visits confirmed. She later learned he was incarcerated.

98. When Father was released from incarceration he did not attempt to contact Ms. Branson to set up visits with [Children]. Ms. Branson continued to try and schedule visits for Father when he was not in jail.

99. Ms. Branson attempted to contact Father in November 2016 but he did not respond to her attempts.

100. In December 2016, Father was with Mother. Father came into the Cummins [Behavioral Health] office to get documents for his probation but made no efforts to speak with Ms. Branson or set up a visit with [Children]. Father had no visits in December 2016.

101. Ms. Branson was only able to successfully supervise one visit for Father despite having approximately twenty visits

scheduled and despite her providing him with a written schedule of his visits.

102. Father was unsuccessfully discharged from supervised visits and parenting skills in December 2016 once Father was incarcerated again.

103. In January 2017, Father completed a substance abuse assessment with Deanne Collins at the Hamilton Center. Father admitted to using methamphetamine and marijuana. Father also admitted to having visual and auditory hallucinations, high anxiety, and depression.

104. Ms. Collins recommended Father participate in the Matrix program, attend individual counseling, and meet with the nurse practitioner to obtain mental health medications if needed. The [M]atrix program is a substance abuse program in Putnam County.

105. Ms. Collins informed Father of her recommendations at the end of his assessment. Father understood the recommendations and made a follow-up appointment to begin the services.

106. Father did not appear for his follow up appointment and never participated in the services recommended by Ms. Collins and never met with the nurse practitioner.

107. Father was unsuccessfully discharged from services due to failure to participate.

* * * * *

134. Neither parent has shown a real investment in reunification. At the time of the termination hearing, Mother's circumstances

had not improved since [Children] were removed from her care. Father's circumstances had deteriorated significantly since the dispositional hearing.

135. Nether parent can provide [Children] with a safe and stable home. Neither parent can meet [Children's] physical needs for housing. Neither parent can meet [Children's] mental health needs for a safe and stable home with consistent supervision and therapy. It is not safe for [Children] to be in the care of Mother or Father at this time.

(App. Vol. II at 24-8.) The trial court also included almost twenty findings outlining Father's criminal history relevant to this time period.

[15] We recognize Father's early compliance with services resulted in a trial home visit that lasted a few months. However, since Children were removed from Father's care in July 2016, Father has not complied with services, did not visit Children, tested positive for illegal substances multiple times, was arrested multiple times, and was incarcerated with no clear release date at the time of the termination fact-finding hearing. The trial court's unchallenged findings support its conclusion that the conditions under which Children were removed from Mother and Father's care would not be remedied.[3] *See In re L.S.*, 717 N.E.2d at 210 ("A pattern of unwillingness to deal with parenting problems and

---

[3] As we conclude the findings support the trial court's determination that the conditions that kept Children from returning to Father would not be remedied, we need not determine whether the findings also supported the trial court's determination that continuation of the parent-child relationship posed a threat to the well-being of the children. *See, e.g., In re L.S.*, 717 N.E.2d at 209 (court needs find only one as statute written in the disjunctive).

to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change.").

### Best Interests of Children

[16] In determining what is in Children's best interests, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 990 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in Children's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[17] Father argues termination is not in the best interests of Children because Children have a bond with Father's younger children, who are subject to separate CHINS proceedings, and "it would be detrimental for [Children] to be split from their other siblings." (Br. of Appellant at 13.) Father also contends "he is willing to actively engage and effectively use the services recommended to him to properly care for his children and not put his children at risk for harm." *(Id.* at 14.)

[18]     Regarding the best interests of Children, the trial court found:

> 44.  [Children have] been participating in therapy with Dr. Rose Fernandez for approximately one year.
>
> 45.  Dr. Fernandez is working with [R.M.] on anxiety.  [R.M.] has a lot of anxiety around Mother and Mother's instability and Mother's safety particularly when Mother misses visits with [Children].  [R.M.] was diagnosed with anxiety disorder which means her worries are greater than the normal child.
>
> 46.  [R.M.] has anxiety and guilt about being placed in foster care.  [R.M.] is afraid if she misbehaves the current foster family will send her back.  [R.M.] is making progress on this concern now that she has been in her current foster placement for an extended period of time.
>
> 47.  [R.M.] is making progress in therapy now that she has a stable consistent environment in her current foster family.  [R.M.] is very attached to her current foster Mother, Kathleen.  The stability and consistency in the current foster home has helped ease some of [R.M.s] anxiety.  [R.M.] is not ready to be discharged from therapy with Dr. Fernandez.  If [R.M.] were placed in a situation where the living situation was not stable and consistent she could suffer setbacks.
>
> 48.  [D.M.] is receiving therapy for his disruptive and defiant behaviors and ADHD.  [D.M.] has no insight into how his behaviors impact him or others.  [D.M.] has not made much progress.
>
> 49.  Consistent discipline is important in addressing [D.M.'s] problematic behaviors.  Without consistency [D.M.] is likely to continue to be disruptive at school, with other children and [with] his family.

50. [D.M.] is also receiving therapy to work on appropriate expression of emotions. [D.M.] became very upset when Father went back to jail and said he wanted to kill himself. The therapist and foster mother are working with [D.M.] to understand that [it] is ok for him to be sad instead of turning all of his emotions into a reason to be defiant and destructive.

51. The foster mother has consistently brought [Children] to therapy and she actively participates in the sessions including implementing suggestions from Dr. Fernandez in the home. This active participation by the foster mother has allowed [Children] to make progress in therapy.

52. If [Children] were placed with a caregiver that was not actively engaged in their therapy and did not implement the therapist's suggestions in the home environment [Children's] progress would be set back.

53. If [D.M.] were placed back in a home with domestic violence he would continue to demonstrate defiant and destructive behaviors instead of learning to express his emotions in a healthy and constructive way.

54. [Children] have higher needs than a typical child meaning they will require more adult supervision. A stable environment is very important. Moving [Children] around could cause attachment issues, depression and trauma.

(App. Vol. II at 19-20.) Additionally, the trial court noted Children "live with their younger two (2) siblings in care of the current foster family." (*Id.* at 29.)

In addition to the findings regarding Children's progress in foster care and their need for consistency, the trial court found Father had not participated in

services, had not engaged in domestic violence services, had rendered multiple positive drug screens, and had been incarcerated for a significant time during the proceedings. The trial court's unchallenged findings support its conclusion that termination was in Children's best interests. *See A.D.S. v. Indiana Dept. of Child Services*, 987 N.E.2d 1150, 1159 (Ind. Ct. App. 2013) (termination in Children's best interests based on Children's improvement in foster care and Mother's inability to complete services and maintain sobriety), *trans. denied*.

# Conclusion

[20] We conclude the trial court's unchallenged findings support its conclusions that the conditions under which Children were removed from Father's care would not likely be remedied and that termination was in Children's best interests. Accordingly, we affirm.

[21] Affirmed.

Riley, J., and Mathias, J., concur.